# Bowie *v.* Birmingham Railway & Electric Company.

*Action by Passenger against Street Railway Company for Personal Injuries.*

1. *Street railway: rule requiring white and negro passengers to occupy different parts of car reasonable.*— A rule or regulation of a street car company requiring white passengers to occupy seats in one portion of the cars operated by it on a certain line of its road and negro passengers to occupy seats in another portion of said cars, is reasonable; and the right of the company to adopt and enforce such rule or regulation is founded on its right of private property in the means of conveyance and the public interest.

2. *Same; same.*—It can make no difference in the enforcement of such rule or regulation that the company runs but one car, and this car is without partition to separate the seats set apart for the occupancy of the white passengers from those provided for the negroes.

3. *Same; same; when the determination of the reasonableness of the rule a question of law for the court.*—When the existence

[Bowie v. Birmingham Railway & Electric Company.]

of such a rule or regulation is established by the evidence,. and its violation is shown by a passenger, who brings an action against the company for being ejected from the part of a car in which, under the rule, she was not entitled to a seat, the reasonableness of the regulation is a question of law for the determination of the court, and not one for the consideration of the jury.

4. *Action by passenger to recover damages for personal injuries; proof must sustain averments of complaint.*—In an action by a passenger against a street railroad company to recover damages for personal injuries alleged to have been caused by being ejected from a car by the joint action of the conductor and motorman, to authorize a recovery, it must be shown that the conductor and motorman jointly and together ejected the plaintiff from the car; and where there is evidence tending to show that the motorman took no part in the ejection,. a charge which instructs the jury that if they believe from the evidence "that the motorman did not aid or assist in the ejection of the plaintiff," they must find for the defendant. asserts a correct proposition, and is properly given.

APPEAL from the City Court of Birmingham.

Tried before the Hon. W. W. WILKERSON.

This was an action brought by the appellant against the appellee. The complaint contained two counts. The first count alleged that the plaintiff, on June 26, 1896, became and was a passenger on one of the cars operated by the defendant company along its electric street railway; "and while so upon said car she was assaulted, struck and wrongfully ejected therefrom by the agents and servants in the charge and control of said car, to-wit, the conductor, one Lavender, whose name is otherwise unknown to plaintiff, the motorman, whose name is unknown to plaintiff, or defendant," whereby she suffered the injuries complained of.

The second count of the complaint, after alleging that the defendant operated an electric street railway in the city of Birmingham, further averred that on June 26, 1896, the plaintiff purchased a ticket to ride on one of the lines of defendant's road, and had gotten on one of the cars of the defendant as a passenger; "but before she could take her seat thereon she was assaulted

by the servants and employés of defendant, to-wit, the conductor, one Lavender, whose other name is otherwise unknown to plaintiff, and the motorman, whose name is wholly unknown to plaintiff, having the charge and control of said car, and forcibly and wrongfully ejected therefrom and not allowed to ride thereon, although there was ample room on the same for plaintiff to ride," whereby she suffered the injuries complained of.

The testimony for the plaintiff tended to show the following facts: On the 26th day of June, 1896, the defendant owned and operated an electric railway from the city of Birmingham to the suburban town of East Lake; the electric cars on said line were at that time open cars, having each fourteen seats running across the entire width of the cars, which seats were reached by stepping from the ground upon a "running board," extending the full length of the car on each side, and then stepping into an aisle which ran across the full width of the car in each section between the seats; said seats faced each other in sections, two seats being in each section, and were made with their backs joined together; all of said seats were fixed and immovable, and were long enough to seat about six grown people of average size on each seat, and the seat backs extended as high as the shoulders of passengers sitting upon them; said cars were run separate on said line, but were scheduled several minutes apart, and each car was operated and controlled by a motorman and conductor; the motorman standing upon a platform at the front end of the car where the electric motor was fixed, and the conductor exercising general supervision over the car and passengers.

During the morning of said June 26th, the plaintiff, who is a negro woman, and who was at that time a negro school teacher, and who also had charge of a large Sunday school class of negro children, undertook to go with this class of negro children to a picnic on said East Lake car line between Birmingham and East Lake and attempted to take passage, having already passage tickets for herself and Sunday school class in her hands,

upon one of the electric cars on said line which had stopped in front of the Morris hotel in Birmingham, which was the usual place where said cars waited for passengers at the Birmingham terminus of said car line; there were near one hundred Sunday school children in the entire party and three or four grown women and two or three men, including one Brown, the superintendent of the Sunday school. The plaintiff assisted in getting all the children on the car and the entire car, except the two seats of the rear section, was filled by said children. After the children had all gotten into the car plaintiff stepped into the car and was about to take her seat upon the second seat from the rear end of the car. There were two or three white ladies and one or two white men seated upon the seat of the car which was facing the one upon which the plaintiff started to sit; but this particular seat upon which plaintiff started to sit was entirely vacant. Just as plaintiff was about to take her seat the conductor of the car stepped on the "running board" of the car at the end of the seat where plaintiff was about to sit and told plaintiff not to sit there, but to get out from between those seats and walk to the opposite end of the car and take a seat there. Plaintiff replied to the conductor that she had just helped to pack the car with Sunday school children, and every other seat in the car she knew to be taken, and that she would sit where she had started to sit. The conductor then commanded the plaintiff to get out from the seat where she was about to sit, and find a seat in the front end of the car. Plaintiff replied to the conductor: "If you will show me a seat I will go to it; but otherwise I will sit here." The conductor thereupon took plaintiff by the arm and attempted to push her from the seat where she was about to sit, and out of the car. Plaintiff took hold of the back of the seat to keep from being pushed, and told the conductor to turn her loose and she would get out herself, but the conductor continued to push plaintiff and at this moment was reinforced by the motorman, who had run around from the front of the car and caught plaintiff by the ankle, and together they pushed and pulled her off the seat on to the "running

board," where she would have fallen to the ground had she not been caught by Brown, the colored Sunday school superintendent, who prevented her from falling.

The plaintiff had her left leg severely bruised, and left ankle and knee sprained by being pushed out of the car by the conductor, which injury resulted in a case of traumatic rheumatism in the plaintiff's left leg, from which she long suffered, and was still suffering at the time of the trial of this case, and which is probably permanent.

The defendant's testimony tended to show that the conductor did not use any more force than was reasonably necessary to eject the plaintiff from the seat which she was about to take, and that although the motorman came around from the front of the car to where the plaintiff was, he did not put his hands on her or assist in her ejection; and that while a portion of the car was occupied with a large crowd of Sunday school children, there was ample and sufficient unoccupied space upon the extreme end seat at the front end of the car to comfortably seat other and more passengers, and that defendant's conductor and motorman both told plaintiff that she could get a seat at this front end and directed her to take such seat, and the conductor did not attempt to eject her from the car until she refused to change her seat. The defendant's testimony also showed without contradiction that upon its East Lake car line there was a rule and custom that had been practiced on said line ever since cars had been put on that line that colored passengers would occupy the seats in the front end of the car; that this rule and custom was generally known; that both white and colored passengers in taking seats in the car conformed to this rule and custom; that the conductor required passengers to conform to this rule and custom; and that six or eight months before the occurrence involved in the present case, the plaintiff was ejected from the car for refusing to comply with this rule. The general manager of the defendant had issued and published a bulletin order directing and requiring conductors on its East Lake line to seat colored passengers in the front end of the car and white passengers in the rear end of the car; that

26

[Bowie v. Birmingham Railway & Electric Company.]

such bulletin order was still in force at the time plaintiff was ejected; but said rule was not published by any notice posted in the cars or along the car line, or in any pamphlet, newspaper, or otherwise than by said bulletin order to conductors issued by the general manager, and the dividing line between the white and colored passengers was not fixed by said rule, but was left entirely to the conductor to fix and enforce as, in his judgment, the circumstances and numbers of passengers of each color might require.

It was shown that the car upon which plaintiff took passage had no partition in it, and it was further shown that the defendant corporation, at the time of the alleged injury, also owned and operated several other lines of street cars in the city of Birmingham, and that upon these other lines the defendant corporation had no rule or requirement in regard to white and colored passengers sitting in separate portions of the cars, as was required by the rules of the East Lake line, but upon their other car lines negroes were permitted to sit with the white passengers according to their own choice of seats.

The court refused to give several charges requested by the plaintiff, but as these charges were not insisted upon in argument, it is not necessary to set them out in detail.

The court, at the request of the defendant, gave to the jury the following written charges, and to the giving of each of them the plaintiff separately excepted: (1.) "If you believe from the evidence that the conductor used no more force than was reasonably necessary to enforce in a proper manner a rule requiring colored passengers to sit in the front part of the car, then I charge you that your verdict must be for the defendant." (2.) "The court charges the jury that a rule, if you believe from the evidence there was such a rule, requiring white passengers to occupy seats provided in the rear of the car, and requiring colored passengers to occupy seats provided in the front of the car, was a reasonable regulation." (3.) "If you believe from the evidence that at the time plaintiff claims she was

ejected from the car, the defendant had in force on its East Lake railroad a rule requiring colored passengers to sit in the front part of the car, and white passengers to sit in the rear part of the car, and if you further believe from the evidence that the conductor used no more force than was reasonably necessary to enforce such rule in a proper manner, you must find for the defendant." (4.) "If you believe from the evidence that the conductor requested the plaintiff to take a seat in the forward end of the car; that she refused to comply with the request; that she could have found in the forward end of the car a vacant seat; that at the time there was a rule in force requiring colored passengers to sit in the forward end of the car; that the conductor used no more force than was necessary to reasonably enforce such rule in a reasonable and proper manner, you must find for the defendant." (5.) "The court charges the jury that the defendant was not required to keep and maintain separate compartments or cars for its white and colored passengers." (6.) "If you believe from the evidence that the motorman did not aid or assist in the ejection of the plaintiff, you must find for the defendant." (7.) "I charge you, gentlemen of the jury, that under the law the defendant was not required to provide a separate car for the colored race on its East Lake railroad, nor was the defendant, under the law, required to divide its cars on such railroad by partitions, so as to secure for the race separate accommodations." (8.) "If you believe from the evidence that on and before the 26th day of June, 1896, there was a rule in force on the defendant's East Lake railroad, a rule requiring colored passengers to sit in the front part of the car, and for white passengers to sit in the rear part of the car; that the conductor requested the plaintiff to take a seat in the front end of the car, and that the plaintiff refused to take a seat in the front end of the car when so requested; that there was room for her to take a seat in the front part of the car; that no more force was used than was necessary to have her comply with such rule, then I charge you that you must find for the defendant." (9.) "If you believe from the evidence that on or before

the 26th day of June, 1896, there was a rule in force on the defendant's East Lake railroad requiring colored passengers to sit in the front part of the car, I charge you that such rule was reasonable." (10.) "I charge you, gentlemen of the jury, that if under the evidence in this case, if you believe it, you should find that there was in force at the time plaintiff claims to have been injured a rule on the defendant's East Lake line of street railroad requiring negro passengers to ride in the front end of the car, and white passengers to ride in the rear end of the car, such rule is reasonable, and you are not authorized from the evidence to find that it was the duty of the defendant to put in its car a partition to separate negro and white passengers, instead of such reasonable rule."

There were verdict and judgment for the defendant. The plaintiff appeals, and assigns as error the giving of the charges requested by the defendant.

H. K. WHITE, for appellant.—The *reasonableness* of the regulation for the separation of the races on that particular car line of the appellee was a question *for the jury* and should have been left to them to determine under all the facts and circumstances of the case. Whether any particular regulation which is pleaded is reasonable, is a mixed question of law and fact to be determined upon evidence of all the circumstances tending to show that it was necessary and proper, or otherwise; and it cannot be determined by the court as a pure question of law. It is like the question as to the reasonableness of *time, care or skill.—Day v. Owen*, 5 Mich. 520; *Jencks v. Coleman*, 2 Sumn. (U. S. C. C.), 221; *Chesapeake Ins. Co. v. Stark*, 6 Cranch, 268; *Maryland Ins. Co. v. Ruden*, 6 Cranch, 338.

WALKER, PORTER & WALKER, *contra.*

TYSON, J.—There are two questions presented for consideration by the record in this case. The first in-

volves the reasonableness of a rule or regulation of the
defendant requiring white passengers to occupy seats in
one portion of the cars operated by it on a certain line
of its road, and negroes to occupy seats in the other por-
tion. The car upon which the plaintiff was a passenger
when the regulation under consideration was enforced
against her, was an open car, the seats for passengers ex-
tending across the entire width, separated by aisles; so
that passengers boarding the car did so by first stepping
from the ground upon a running board, which ran the
full length of it upon either side, and from this running
board into the aisle facing the seats.

The evidence is undisputed that the plaintiff was a
negro woman, and declined to occupy a vacant seat in
that portion of the car set apart for negroes, but insisted
upon sitting in a seat in that portion assigned by the con-
ductor to white people. It was also without dispute that
a rule or regulation had been enforced on this line ever
since cars had been operated over it, to the effect that
negro passengers should occupy the seats in the front
end of the car and white passengers should occupy the
seats in the rear end. That this rule was generally
known and conformed to by both white and colored pass-
engers. It was also generally known that the conductor
of the car required passengers to conform to this regu-
lation. That six or eight months before this occurrence,
the plaintiff was ejected from one of the cars for re-
fusing to comply with this rule. This rule or regulation
was promulgated by the manager of the defendant's
company by being posted and published in a bulletin or-
der directing and requiring conductors on this line of
road operated by defendant to observe and enforce it,
and was in force at the time the injury to the plain-
tiff, here complained of, was suffered. The dividing line
between the seats to be occupied by white and negro
passengers was not fixed by the rule, but was left to the
conductor to fix and enforce, as, in his judgment, the cir-
cumstances and number of passengers of each race
might require. The seats in all parts of the car were
in all respects alike.

The question here presented was ably considered in

an opinion delivered by Justice AGNEW of the Supreme
Court of Pennsylvania in the case of *West Chester &
Philadelphia Railroad Co. v. Miles*, 55 Pa. St. 209, from
which we quote at length as the reasons he gives for
sustaining the reasonableness of the regulation are so
forcibly stated, and the status of the two races with
reference to each other, as stated by him to exist in
Pennsylvania in 1867, is the status of the two in Ala-
bama today. The facts of that case were these: "Mary
E. Miles, a colored woman, the plaintiff, got into the
car of the defendant at Philadelphia to go to Oxford and
took a seat at or near the middle of it. A rule of the
road required the conductor to make colored persons
sit at one end of the car. He got a seat for her at the
place fixed by the rule and asked her to take it. She
declined positively and persistently to do it. The con-
ductor told her of the rule, requested her to take the
other seat, warned her that he must require her to
leave the car if she refused, and at last put her out.
The simple question is, whether a public carrier may,
in the exercise of his private right of property, and in
the due performance of his public duty, separate passen-
gers by any other well-defined characterization than that
of sex. The ladies' car is known upon every well regu-
lated railroad, implies no loss of equal right on the part
of the excluded sex, and its propriety is doubted by
none.

"This question must be decided upon reasonable
grounds. If there be no clear and reasonable difference
to base it upon, separation cannot be justified by mere
prejudice. Nor is merit a test. The negro may be proud
of his service in the field as a defender of his country.
But it was not thought indefensible to separate even
white soldiers from other passengers. There was a clear
and well founded difference between the civil and mili-
tary character, and the separation of soldiers from citi-
zens implied no want of equality, but a sound regulation
of the right of transit.

"The right of the carrier to separate his passengers
is founded upon two grounds—his right of private
property in the means of conveyance, and the public in-

[Bowie v. Birmingham Railway & Electric Company.]

terest. The private means he uses belong wholly to
himself, and imply the right of control for the protec-
tion of his own interest, as well as the performance of
his public duty. He may use his property, therefore,
in a reasonable manner. It is not an unreasonable regu-
lation to seat passengers so as to preserve order and
decorum, and to prevent contacts and collisions arising
from natural or well known customary repugnancies,
which are likely to breed disturbances by a promiscuous
sitting. This is a proper use of the right of private
property, because it tends to protect the interests of the
carrier as well as the interests of those he carries. If
the ground of regulation be reasonable, courts of justice
cannot interfere with his right of property. The right
of the passenger is only that of being carried safely,
and with a due regard to his personal comfort and con-
venience, which are promoted by a sound and well regu-
lated separation of passengers. An analogy and an illus-
tration are found in the case of an innkeeper, who, if he
have room, is bound to entertain proper guests, and so
a carrier is bound to receive passengers. But a guest
at an inn cannot select his room or his bed at pleasure;
nor can a voyager take possession of a cabin or a berth
at will or refuse to obey the reasonable orders of the
captain of a vessel. But, on the other hand, who would
maintain that it is a reasonable regulation, either of an
inn or a vessel, to *compel* the passengers, black and
white, to room and bed together? If a right of private
property confers no right of control, who shall decide
a contest between passengers for seats or berths?
Courts of justice may interpose to compel those who per-
form a business concerning the public, by the use of pri-
vate means, to fulfill their duty to the public—but not
a whit beyond.

"The public also has an interest in the proper regula-
tion of public conveyances for the preservation of the
public peace. A railroad company has the right and is
bound to make reasonable regulations to preserve order
in their cars. It is the duty of the conductor to repress
tumults as far as he reasonably can, and he may, on
extraordinary occasions, stop his train and eject the

unruly and tumultuous. He cannot interfere in the quarrels of others at will merely. In order to preserve and enforce his authority as the servant of the company it must have a power to establish proper regulations for the carriage of passengers. It is much easier to prevent difficulties among passengers by regulations for their separation, than it is to quell them. The danger of the peace engendered by the feeling of aversion between individuals of the different races cannot be denied. It is the fact with which the company must deal.   *   *   *   These views are sustained by high authority. Judge Story, in his Law of Bailments, stating the duty of passengers 'to submit to such reasonable regulations as the proprietors may adopt for the convenience and comfort of the other passengers, as well as for their own proper interests,' says: 'The importance of the doctrine is felt more strikingly in cases of steamboats and railroad cars.'—§ 591, a; see also § 476, a; Angell on Carriers, § 528; 1 American Railway Cases, 393, 394.,

"The right to separate being clear in proper cases, and it being the subject of sound regulation, the question remaining to be considered is, whether there is such a difference between the white and black races within this State, resulting from nature, law and custom, as makes it a reasonable ground of separation. The question is one of difference, not of superiority or inferiority. Why the Creator made one black and the other white, we know not; but the fact is apparent and the races distinct, each producing its own kind, and following the peculiar law of its constitution. Conceding equality, with natures as perfect and rights as sacred, yet God has made them dissimilar, with those natural instincts and feelings which He always imparts to His creatures when He intends that they shall not overstep the natural boundaries He has assigned to them. The natural law which forbids their intermarriage and that social amalgamation which leads to a corruption of races, is as clearly divine as that which imparted to them different natures. The tendency of intimate social intermixture is to amalgamation, contrary to the law of races. The

separation of the white and black races upon the surface of the globe is a fact equally apparent. Why this is so it is not necessary to speculate; but the fact of a distribution of men by race and color is as visible in the providential arrangement of the earth as that of heat and cold. The natural separation of the races is, therefore, an undeniable fact, and all social organizations which lead to their amalagamation are repugnant to the law of nature. From social amalgamation it is but a step to illicit intercourse, and but another to intermarriage. But to assert separateness is not to declare inferiority in either; it is not to declare one a slave and the other a freeman—that would be to draw the illogical sequence of inferiority from difference only. It is simply to say that, following the order of Divine Providence, human authority ought not to compel these widely separated races to intermix. The right of such to be free from social contact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations, as far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts.

" * * * * * Never has there been an intermixture of the two races, socially, religiously, civilly or politically. By uninterrupted usage the blacks live apart, visit and entertain among themselves, occupy separate places of worship and amusement, and fill no civil or political stations, not even sitting to decide their own causes. In fact, there is not an institution of the State in which they have mingled indiscriminately with the whites. Even the common school law provides for separate schools when their numbers are adequate. In the military service, also, they were not intermixed with the white soldiers, but were separated into companies and regiments of color, and this not by way of disparagement, but from motives of wisdom and pru-

[Bowie v. Birmingham Railway & Electric Company.]

dence, to avoid the antagonism of variant and immiscible races. Law and custom having sanctioned a separation of races, it is not the province of the judiciary to legislate it away. We cannot say there was no difference in fact, when the law and the voice of the people had said there was. The laws of the State are founded on its constitution, statutes, institutions and general customs. It is to these sources judges must resort to discover them. If they abandon these guides they pronounce their own opinions, not the laws of those whose officers they are. Following these guides, we are compelled to declare that, at the time of the alleged injury, there was that natural, legal and customary difference between the white and black races in this State which made their separation as passengers in a public conveyance the subject of a sound regulation to secure order, promote comfort, preserve the peace and maintain the rights of both carriers and passengers."

In *Hall v. McGuir*, 95 U. S. 485, which was a suit by a negro woman against the owner of a steamboat for refusing her accommodations, on account of her color, in the cabin specially set apart for white persons, the court, after citing approvingly the case above quoted from, said: "Where the passenger embarks without making any special contract, and without knowledge as to what accommodations will be afforded, the law implies a contract which obliges the carrier to furnish suitable accommodations, according to the room at his disposal; but the passenger in such a case is not entitled to any particular apartments or special accommodations. Substantial equality of right is the law of the State and of the United States; but equality does not mean identity, as, in the nature of things, identity in the accommodation afforded to passengers, whether colored or white, is impossible, unless our commercial marine shall undergo an entire change. Adult male passengers are never allowed a passage in the ladies' cabin, nor can all be accommodated, if the company is large, in the staterooms. Passengers are entitled to proper diet and lodging; but the laws of the United States do not require the master of a steamer to put persons in the same

apartment who would be repulsive or disagreeable to each other.

"Steamers carrying passengers as a material part of their employment are common carriers, and as such enjoy the rights and are subject to the duties and obligations of such carriers; but there was and is not any law of Congress which forbids such a carrier from providing separate apartments for its passengers. *What the passenger has a right to require is such accommodation as he has contracted for, or, in the absence of any special contract, such suitable accommodations as the room and means at the disposal of the carrier enable him to supply; and in locating his passengers in apartments and at their meals, it is not only the right of the master, but his duty, to exercise such reasonable discretion and control as will promote, as far as practicable, the comfort and convenience of his whole company.*"

Boothe on Street Railways (§ 325), says: "The doctrine that, in the absence of statutory inhibition, a common carrier may lawfully make color a basis of classification and require its white and colored passengers to occupy separate cars or different parts of the same car when like accommodations are provided, has received the support of many of the courts, both State and Federal, and is the rule which has been followed in the greater number of decisions heretofore rendered." See also cases cited by Boothe on Street Railways in note 3 on page 443, and note 1 on page 444; *Plessy v. Ferguson*, 163 U. S. 537.

The other question presented is whether the reasonableness of the rule is a mixed question of law and fact, or merely a question of law for the court.

The principle upon which the reasonableness of the rule is sustained in this case is that the carrier's right of property in the means of the conveyance and the public interest are best subserved by a separation of negro and white passengers; that their separation tends to secure order, promote comfort, preserve the peace and maintain the rights of both carrier and passengers. When the rule is established by the evidence and its

violation shown by a passenger undisputedly, it is a question of law for the court. It is of no consequence that the defendant company operated other lines and no such regulation is enforced by it upon them. The fact that it does not exercise the right to establish and enforce such a regulation upon its other lines, affords no reason for saying that the regulation established and enforced in this case is unreasonable, or that the company has no right to establish such a rule. On this phase of the case, the court could have instructed the jury affirmatively, if requested in writing, leaving for consideration by the jury, as it did, the single question whether the conductor used more force than was necessary, in enforcing the rule, under the circumstances.

Charges 1, 3, 4, 8, 9 and 10, given at the request of the defendant, were in conformity with the principles here announced by us and, therefore, there was no error in the giving of them.

Charges 5 and 7 are admitted by appellant to involve no error.

Charge 6 is insisted to be erroneous for three reasons: (1st) It directs a verdict for the defendant without referring to the jury the amount of force used by the conductor in ejecting the plaintiff. (2d.) It directs a verdict for defendant without referring to the jury whether there was a vacant seat in the car for plaintiff to take; and (3d) It withdraws from the jury the question of the reasonableness of the defendant's regulation. A sufficient answer to these criticisms of the charge is to call attention to the averments of the complaint, which disclosed that the alleged assault or ejection from the car was committed *jointly* by the conductor and motorman. The plaintiff must prove her cause of action in manner and form as alleged.

The charges refused to the plaintiff are not insisted upon in argument and we will not consider them, except to say that they contravene the principles here declared, and there was no error in their refusal.

The judgment is affirmed.