# Mobile & Ohio R. R. Co. *v.* Spenny.

## *Damage to Passenger.*

(Decided December 15, 1914.　Rehearing denied January 12, 1915.
67 South. 740.)

1. *Constitutional Law; Public Conveyances; Separate Travelling
Accommodation; Railroads.*—Sections 5487, 5488 and 7684, Code 1907,
are a valid exercise of the police power to preserve peace and order,
and to prevent race contact and collision and do not deny the equal
protection of the law.

2. *Same; Delegation of Power; Suspending Law.*—If construed as
conferring on conductors the discretion to assign passengers to their
accommodations, such provisions of the statutes would amount to
authority to suspend law by others than the Legislature and would
violate section 21, Constitution 1901.

3. *Carriers; Passengers; Segregation of Races; Ejection.*—Under
the sections of the Code relative to the segregation of the races,

and providing separate accommodations for them by the railroads, there is no exemption in favor of a white sheriff travelling with a negro prisoner, and if such sheriff refuses to go into the negro compartment or to send the prisoner there, and remain in the white compartment, but insists upon remaining with his negro prisoner in the white compartment, the conductor was authorized and required by law to eject him; and if he was ejected without violence or indignity, the carrier is not liable.

(Thomas, J., dissents in part.)

APPEAL from Autauga Circuit Court.

Heard before Hon. W. W. PEARSON.

V. A. Spenny sues the Mobile & Ohio R. R. Co. for damages for ejecting him while a passenger, under the circumstances as set out in the opinion. Judgment for plaintiff and defendant appeals. Reversed and remanded. (This cause was taken by certiorari to the Supreme Court where the majority opinion was affirmed.—*Spenny v. Mobile & O. R. Co.*, 68 South. 780. Reporter.)

STEINER, CRUM & WEIL, for appellant. The assignments of error present for consideration or raise the construction given by the court to certain sections of the Code, which appellant insist are erroneous. These sections are 5487, 5488, 5492 and 7684, Code 1907. As to the validity of the sections it is a question of law, and this court has held such a rule, reasonable, valid and constitutional as to intrastate passengers.—*Bowie v. Birmingham Ry.*, 125 Ala. 397. The following authority uphold their constitutionality, even as to interstate passengers.—18 L. R. A. 639 and notes; 41 L. Ed. 256; 2 L. R. A. (N. S.) 1108 and notes, 101 S. W. 386, affirmed by the U. S. Supreme Court on writ of error in 54 L. Ed. 936. Written charges 1, 2 and 3 should have been given.—*Bowie v. Birmingham Ry. Co., supra;* Lewis Southerland Stat. Const. 448, 36 Wis. 450, 43 S. W. 443. See especially as applicable to the facts and the law of this case, the Texas case reported in 158 S. W. 1045.

HILL, HILL, WHITING & STERN, for appellee. The complaint was not subject to the demurrer imposed.— *L. & N. R. R. Co. v. Person,* 144 Ala. 325; *Birmingham R. L. & P. Co. v. Jung,* 161 Ala. 461. Plaintiff was entitled to recover actual damages for humiliation.—*Birmingham R. L. & P. Co. v. Turner,* 154 Ala. 543; *L. & N. R. R. Co. v. Hine,* 121 Ala. 238. As to a proper construction of the sections of the Code involved in this issue, plaintiff contends that he and his prisoner had a right to occupy a seat in the white smoker; that it was not intended to include a sheriff traveling with a prisoner, and that if such was the intent, such inclusion is void as against public policy.—4 Mayfield 489, 451, et seq. 35 Cyc. 1527; 67 N. J. L. 139; *Ryan v. Couch,* 66 Ala. 244; *Napier v. Foster,* 80 Ala. 379; *Williams v. Board of Revenue,* 123 Ala. 138.

THOMAS, J.—The action is by the appellee, Spenny, against appellant railroad company for damages for ejecting him from one of the latter's passenger trains. The facts of the case are practically without dispute and may, so far as material to the consideration here, be briefly stated as follows: The appellee is a, white man, and was, at the time of such ejection, sheriff of Autauga county, Ala., and had then in his custody a negro prisoner, with whom he had boarded said train at Montgomery, Ala., for transportation to Prattville, Ala., having then in his possession, for which he had paid full fare, two regular tickets for the journey over appellant's line of railway, one for himself and one for the prisoner. Upon boarding the train he went with his prisoner into the smoking compartment thereof that was set aside as such for white passengers; and where he and the negro prisoner were each seated when the conductor of the train came through and, upon inform-

ing appellee that under his (the conductor's) under-
standing of the requirements of the law and of the
rules of the company, he (the appellee) was not per-
mitted to keep the negro prisoner in such smoking com-
partment provided for white people, directed that ap-
pellee carry the prisoner into the adjoining compart-
ment provided for passengers of the negro race, and left
it optional with the appellee whether he would remain
in there with the prisoner or return and be seated in the
compartment for white people. Appellee refused to
comply with the order, but asserted a right to keep the
negro prisoner in the white smoking compartment with
him (appellee); whereupon, for disobedience to the or-
der of the conductor, the appellee with his prisoner was
ejected from the train at Montgomery, no violence hav-
ing been used, nor indignity offered, nor abuse indulged
in, in doing so.

Whether or not, therefore, the appellee has a case de-
pends, of course, upon the question as to whether the
ejection was rightful or wrongful. There can be no
question as to the authority of a conductor to eject any
passenger for disobedience to any lawful order, direc-
tion, or requirement made and rendered necessary in
the proper and lawful management and conduct of the
train of which the conductor has charge.—5 Am. & Eng.
Ency. Law, 594 et seq.; Code, § 5492. Was the order
or requirement made by the conductor on the appellee in
this case a lawful one? The answer to this question de-
pends upon what construction should be and is given to
sections 5487, 5488, and 7684 of the Code, which read
as follows: "(5487) All railroads carrying passengers
in this state, other than street railroads, shall provide
equal but separate accommodations for the white and
colored races, by providing two or more passenger cars
for each passenger train, or by dividing the passenger

[Mobile & Ohio R. R. Co. v. Spenny.]

cars by partitions, so as to secure separate accommodations." "(5488) The conductor of each passenger train is authorized and required to assign each passenger to the car or the division of the car, when it is divided by a partition, designated for the race to which such passenger belongs; and if any passenger refuses to occupy the car, or the division of the car, to which he is assigned by the conductor, such conductor may refuse to carry such passenger on the train, and for such refusal neither the conductor nor the railroad company shall be liable in damages. But this section shall not apply to cases of white or colored passengers entering this state upon railroads under contracts for their transportation made in another state where like laws do not prevail." "(7684) Any person who, contrary to the provision of the statute providing for equal and separate accommodations for the white and negro races on railroad passenger trains, rides, or attempts to ride, in a coach, or division of a coach, designated for the race to which he does not belong, must, on conviction, be fined not more than one hundred dollars."

The validity of these statutes as constitutional enactments in the exercise by the Legislature of the police power of the state is not at all, and could not successfully be, questioned. Like ones in other states have run the gauntlet of the Supreme Court of the United States, and their constitutionality there tested by the federal Constitution and upheld.—*Plessy v. Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256. See, also, *Ex parte Plessy,* 45 La. Ann. 80, 11 South. 948, 18 L. R. A. 639; *So. Ry. Co. v. Thurman,* 121 Ky. 716, 90 S. W. 240, 2 L. R. A. (N. S.) 1108; *Bowie v. Birmingham Ry. Co.,* 125 Ala. 397, 27 South. 1016, 50 L. R. A. 632, 82 Am. St. Rep. 247; *Childs v. Chesapeake & Ohio R. Co.,* 125 Ky. 299, 101 S. W. 386, 11 L. R. A. (N. S.) 268, af-

firmed by U. S. Sup. Ct. in 218 U. S. 71, 30 Sup. Ct. 667, 54 L. Ed. 936.

The reasoning upon which all these cases proceed and are founded is perhaps most tersely expressed in the case of *Westchester, etc., R. Co. v. Mills,* 55 Pa. 209, 93 Am. Dec. 744, decided by the Supreme Court of Pennsylvania as far back as the year 1867, cited by the Supreme Court of the United States in *Plessy v. Ferguson, supra,* and by the Supreme Court of Alabama in *Bowie v. Birmingham Ry. Co., supra,* and where, in upholding the reasonableness of rules adopted by a carrier that were of purport similar to the statute here, it was said: "The right of the carrier to separate his passengers is founded upon two grounds—his right of private property  *  *  *  and the public interest. The private means he uses belongs wholly to himself, and imply the right of control for the protection of his own interest, as well as for the performance of his public duty. He may use his property, therefore, in a reasonable manner. It is not an unreasonable regulation to seat passengers so as to preserve order and decorum, and to prevent contacts and collisions arising from natural or well-known customary repugnances, which are likely to breed disturbances from promiscuous sitting.  *  *  * It is much easier to prevent difficulties among passengers by regulations for their proper separation than it is to quell them. The danger to the peace engendered by the feeling of aversion between individuals of the different races cannot be denied. It is the fact with which the company must deal. If a negro takes his seat beside a white man, his wife, or his daughter, the law cannot repress the anger, or conquer the aversion which some will feel. However unwise it may be to indulge the feeling, human infirmity is not always proof against it. It is much wiser to avert the consequences of this repulsion

of race by separation, than to punish afterwards the breach of the peace it may have caused."

These considerations—a desire to promote to public peace by preventing and removing conditions which would likely, if not assuredly, endanger it, if persons of the white and negro races were permitted to be brought into such intimate contact, relationship, and association as they would be when occupying as fellow passengers with equal rights the same passenger car or compartment on a railroad train—led to the enactment of the statute here under consideration, providing, as seen, for "equal but separate accommodations" for each and prohibiting, under penalty, the member of either race from riding in the car or compartment designated and set aside by the carrier for members of the other race, and authorizing the conductor to eject any passenger not complying with the requirements of the statute when directed to do so.

What, then, are we to do with the case here, where a sheriff of one race (the white race) boards a train with a prisoner in his custody of a different race (the negro race)? Must the officer, who is responsible under the law for the custody and safe-keeping of his prisoner and criminally liable if he permits him to escape (Code, § 6858 et seq.), abandon him, after he boards a train with him for the purpose of removing or transferring him in pursuance of the law's requirements from one point to another, by leaving him in one coach and keeping himself in another coach, or compartment, during the journey; or must he, in order to avoid such absurdity, and whenever necessity arises for such removal or transfer, adopt other modes or means of conveyance than that of railroads; or can we so construe the statute cited as to permit a white officer with a colored prisoner (or, what is the same proposition, a colored officer with a white

prisoner—should that condition ever again happen) to ride in the same coach; if so, which coach shall it be, the white coach or the negro coach; and which coach shall they occupy when the officer is of one or the other race and has two prisoners, one white and the other a negro?

The field of investigation and research for authorities in aid of an answer to these pertinent questions seems to have been exhausted by the learned and zealous counsel representing opposing views, and we are cited to but two cases—these in the briefs of appellant's counsel—which appear to have any direct bearing on the proposition.

The first of these, however (*L. & N. R. R. Co. v. Catron,* 102 Ky. 323, 43 S. W. 443), while analogous to the case here as to the facts which evoked or occasioned the decision there, is yet so different, by reason of a provision found in the statute there under consideration, and not found in ours, as to the legal propositions involved, that we do not regard that case as really furnishing any authority for the contention of the appellant here that the action of its conductor was authorized and justified by our statute. The mentioned case was decided by the Supreme Court of Kentucky, in which state a statute exists practically identical with ours, except that at its end is found the following clause, which does not, as seen, appear in ours, to wit: "The provisions of this act shall not apply to employees of railroads or persons employed as nurses, or officers in charge of prisoners."

In that case a deputy sheriff got on a train with a negro prisoner and was told by the conductor that the negro would have to be taken into the negro coach, but that he, the officer, himself could occupy the white or the negro coach, either, as he might choose. The officer insisted that he had the right to keep the prisoner in

the white coach with him; but finally submitted, under protest, to the order of the conductor, carried the prisoner into the negro coach, where he remained with him during the journey, and afterwards sued the railroad company for damages for humiliation. The Kentucky court, in denial of his right of action, had this to say with respect to the statute and the quoted exception to it: "The precise question to be here determined is the effect of the clause in section 801 reading, "The provisions of this act shall not apply to  *   *   *  officers in charge of prisoners.' The evident intention of the Legislature in the enactment of this law was to separate the two races in their travel on the railroad throughout the state, as is likewise the policy in the schools, and at the same time providing that colored passengers should have equal rights. But it was recognized that to make this separation of the races absolute, and in all cases, would be impracticable as to the railroad employees. If the white man must keep out of the colored coach, and the colored man keep out of the white coach, in all cases, there would have to be two sets of trainmen on one train. So the exception was made in behalf of the employees. They may of course, go in either coach. Again recognizing the necessity in a great many cases that persons traveling should be accompanied by a nurse, this nurse was included in the excepting clause. The law not applying to the nurse, she may go with her charge. This was, of course, done in order that the child or invalid might have the services of the nurse on the journey. This nurse can occupy the car assigned to her race, or to the one of the child or invalid. But there is a third class of persons who are also excepted from the provisions of the act, viz., 'officers in charge of prisoners.' The exception is not to the prisoner, but to the officer; and being connected in the same sentence with

the exception in favor of the employees and of nurses, we conclude that the same rule applies to the officer in charge of a prisoner. * * * He may occupy the car assigned to his race, or he may occupy the car of the race of the prisoner, but the prisoner must in all cases occupy the car assigned to his race. The exception is not made to the prisoner or for his benefit, but to the officer, that he may accompany the prisoner and detain him. * * * We are of opinion that under the law the conductor was compelled to assign the negro lunatic to the car set apart for colored persons, and if appellee refused to separate from his prisoner. he had a right to ride in that car, or he had the right to ride in the other car (the car for white persons), as the conductor informed him he could do."

The conclusion was that upon the undisputed evidence the officer there had no case, but, as before said, and what is clear from the excerpt given, the opinion is rested solely upon the language of the excepting clause to the statute and sheds no light that we can see on the problem here confronting us as to the proper construction of a statute that makes no exceptions.

The other case referred to as cited by appellant is that of *Gulf, C., etc., Ry. Co. v. Sharman* (Tex. Civ. App.) 158 S. W. 1045, recently decided by the Court of Appeals of Texas, and which is, it must be conceded, practically on all fours with the case here, both as to the character of the facts and of the statute involved. In that case, the sheriff of Liberty county, Tex., a white man, boarded the train with a negro prisoner for transportation from one point in the state of Texas to another, taking a seat with his prisoner in the smoking compartment provided for white people, and was forced under protest, to carry him into the negro coach, where he was forced to remain with him out of fear that if he

left the prisoner the latter might escape. In reviewing on appeal a judgment rendered in his favor against the carrier, the said Court of Appeals disposed of the question here involved in the following language: "The laws of this state [citing the statutes] require railway companies to furnish separate coaches for white and negro passengers, and prohibits either race from riding in the car provided for the other race, and provides that conductors 'shall have the authority to refuse any passenger admittance to any coach or compartment in which they are not entitled to ride under the provisions of this law; and the conductor in charge of the train * * * shall have authority, and it shall be his duty, to remove from a coach * * * any passenger not entitled to ride therein under the provisions of this chapter, and upon his refusal to do so knowingly shall be punished as provided in the Penal Code of this state.' It is the contention of appellant that, under the provisions of this law, the conductor was required to remove said negro from the coach provided for whites. Such is the imperative command of the statute; but there is another statute which requires peace officers to safely keep and guard their prisoners. These statutes must be taken together. Like the oft quoted instance of the surgeon who bled the man that fell down in the street with a fit, and was prosecuted for violating the law against drawing blood in the street, we think 'the rule of reason' should apply to this statute, and that the circumstances of a sheriff having a prisoner in charge creates an exception to the law. If a conductor should strictly enforce this law, he could neither allow the prisoner to ride with the sheriff in the coach for whites, nor allow the sheriff to ride with the prisoner in the coach for blacks; the sheriff being a white man and the prisoner a negro. Nevertheless the law does intend that the races

be separated where practicable; and in this instance, we think the conductor had the discretion to determine whether the negro should ride with the officer in the coach for whites, or the officer with his prisoner in the coach for negroes, and that in determining that the latter course should be pursued he was in the exercise of his legal discretion, which, under the facts of this case, was not abused. While the statute, in terms, equally protects whites from the presence of negroes, and negroes from the presence of whites in their respective coaches, yet it is well known that the leading purpose of this statute was to protect the white race from the pres-ence of negroes while traveling on trains."

Black's Law of Judicial Precedents, p. 400, has, as appropriate here, this to say: "On questions of general jurisprudence and the constructions of domestic statutes, decisions made under a legal system prevailing in another state may be cited as persuasive authority, respected for their reasoning and judgment and followed, if approved, but are not binding as precedents."

We have great respect for the learning and ability of the Texas court, but we cannot follow them in the case cited, for the reason that two of the propositions upon which the conclusion there reached is based, if adopted by us, would bring the act here in conflict with both the state and the national Constitution, if it did not also do so there. In the first place, if we construed the statute here, as they did there, as impliedly conferring on the conductor of the train a discretion and right, when a white officer boarded a train with a negro prisoner, to assign them jointly to either coach he chooses (either to the one provided for whites or to the one provided for colored passengers), it would amount to holding that the act conferred upon the conductor the power of suspending the law in certain cases and would render it re-

pugnant to section 21 of the state Constitution of 1901, which declares: "That no power of suspending laws shall be exercised except by the Legislature."—*Mitchell, etc., v. Florence Dispensary, etc.,* 134 Ala. 392, 32 South. 687; *Harlan v. Clarke,* 136 Ala. 150, 33 South. 858.

We are to avoid such a construction as will make the act unconstitutional, and adopt such only as will harmonize it with the Constitution, unless the language of the act, in plain and unambiguous terms, is such as to forbid, which certainly is not the case here.—26 Am. & Eng. Ency. Law, 640; *Zeiller v. S. & N., etc., R. R. Co.,* 58 Ala. 594; *S. & N. R. R. Co. v. Morris,* 65 Ala. 193; *Edwards v. Williamson,* 70 Ala. 145; *Quartlebaum v. State,* 79 Ala. 1.

In the next place, if, as was done by the Texas court, we hold that the "leading purpose of this statute was to protect the white race from the presence of negroes while riding on trains," it will result in the condemnation of the statute in toto as being in the teeth of the Fourteenth amendment to the federal Constitution, designed, as it was, to prevent discriminations between races in state laws and guaranteeing to each and all "equal protection of the laws."

The only basis upon which statutes like the one here have been sustained by the United States Supreme Court as not being in conflict with the said Fourteenth amendment to the United States Constitution—as will appear from reading the cases hereinbefore cited in that connection—is that such statutes afford equal accommodations for and like protection to each race and were designed as police regulations to prevent breaches of the peace. Whatever private or secret reasons may have actuated the Legislature in the passage of the statute, if any, are not to be considered in construing the statute. We are not permitted to ascribe to them, as did the Tex-

as court, unconstitutional purposes not disclosed in the act; but, the act being consistent in its terms with constitutional purposes, we shall presume that these and these only led to its passage, which was a desire, as we have before said, to promote the public peace by preventing clashes and conflicts between the two races, which would result if it was permitted that they be brought together as fellow travelers in the same railroad car or compartment, and with equal rights therein as such, both as to the matter of sitting and as to all other privileges of passengers.

Can these purposes be subserved without violating the act, if a white sheriff with a negro prisoner is permitted to ride on the train and occupy with him the same car or compartment? If not, then it must follow that the Legislature intended by the act either to deny to officers of the one race in charge of prisoners of the other race this mode of travel, or to relieve them of the responsibility for the custody and safe-keeping of the prisoner whenever such mode was adopted by the officer in the expeditious removal and transfer of such prisoner, legal occasion and necessity for which often arise; for certainly the impossible could not be required of the officer—that is, that he successfully detain his prisoner in the car for colored people and stay himself in the car for white people.—*Wynn v. McCraney,* 156 Ala. 630, 46 South. 854. We do not think that it can be rationally claimed that the Legislature intended either to deny to the officer such mode of travel or to relieve him, when it was adopted, of responsibility for his prisoner.

In what car, or compartment, then, are they to ride together? In the one provided for colored passengers or in the one provided for whites? The answer to the question depends, we think, on the race to which the officer

belongs, and not to the race to which the prisoner belongs; for the reason that the identity and volition of the prisoner is, in legal contemplation, lost and merged into that of the officer who controls his conduct and locomotion. He is, in a sense, no more than bag or baggage, animate, it is true, but he goes only when the officer says "go" and comes only when the officer says "come," and sits where the officer says he must sit. If he is a negro and is carried by a white officer in charge to sit in the coach or compartment set aside for whites, or if he is a white man and is carried by a negro officer to sit in the coach or compartment provided for colored people, then no one could contend that he could be prosecuted and fined for a violation of section 7684 of the Criminal Code hereinbefore quoted, prohibiting, under penalty, persons of one race from riding or attempting to ride in coaches or compartments designated for the other race, because the action of the prisoner in doing so was not voluntary, but done under duress; whereas, if the officer in charge, being of the one race, carries his prisoner, being of the other race, into and remains with the prisoner in the car or compartment designated for the prisoner's race, the officer voluntarily, and not under compulsion, as did the prisoner in the other case, violates the mentioned penal statute and is subject to punishment therefor. Consequently, it is the officer's duty to take his prisoner, whatever be the latter's race, into the car or compartment provided for members of the officer's race. This conclusion violates neither the letter nor the spirit of the statute, since the statute was designed to operate upon persons who are free to act, and not upon prisoners, who are regarded as mere automatons, moving only in response to another's controlling will. Nor will such operation of the statute destroy, or lessen the effectuation of, its purpose to pre-

vent personal clashes and conflicts between members of different races; and this for the reason that the prisoner is in charge of an officer of the race predominating in the car, sworn to conserve the peace, whose duty it would be, as well as his natural desire, to so direct the sitting and locomotion of the prisoner in the car and otherwise control his actions as to obviate every cause or occasion for friction between him and some member of the other race. Besides, it is our observation and opinion that race antipathy rarely, if ever, results in conflict or difficulty between members of opposing races except where each is free to act. A prisoner of one race in the car or compartment of the other race, forced there by the officer, would not likely by his presence, under such circumstances, arouse in members of the other race any personal animosity towards himself or a desire in them to attack him in his defenseless condition.

Appellee here, as before said, had the prisoner in the smoking car for whites, and appellant contends that, if we construe the law so as to permit this, then it must follow that appellee could carry and keep the prisoner with him in any other car provided for whites, even the white ladies car. So far as any provision to the contrary in the statute here is concerned, this is true. If it is to be prevented, then it must be done either by future legislation or by rules which the company itself may adopt. Such rules, so long, as they do not require a separation on the train of the officer and his prisoner, and so long as they permit the officer to ride with the prisoner in a coach or compartment provided for members of the race to which the officer belongs, would not, we think, conflict with the statutes and would be reasonable, although such rules did forbid the officer to carry and keep such prisoner in the ladies' coach.—
*Bass v. Chicago & N. W.*, 36 Wis. 450, 17 Am. Rep. 495;

[Mobile & Ohio R. R. Co. v. Spenny.]

5 Am. & Eng. Ency. Law, 600. Ordinarily, however, even without such rule, a white officer would not inflict the presence of a prisoner in the coach provided for ladies.

The fact that in this case it also appears that the conductor, upon requiring plaintiff officer to remove the prisoner into the negro compartment, offered to leave and keep open the door dividing such negro compartment from the smoking compartment for whites, in which, as said, the officer was at that time, does not alter the case. While such an arrangement might, as urged, have, in this particular instance, kept the prisoner within the view of the officer and so near to him as to have offered him opportunity to prevent the prisoner's escape, if the latter had attempted such, yet, such an arrangement is entirely impracticable as a rule, and, besides, would, it seems to us, result in a violation itself of said law requiring the separation of the races into separate compartments, since by keeping open the door dividing such compartments the partition between them would be practically removed, and thereby the two races would be brought in closer contact than the statute intended. At any rate, if the plaintiff officer had the right, as we think he did for reasons pointed out, to detain the prisoner in the white coach with him, then the conductor had no right to require him to remove such prisoner into the negro coach, although such conductor did offer to keep open the dividing door. If, as appellant contends, a white officer, in order to be and remain with his negro prisoner during the journey on a train, must sit in the negro coach or compartment, then it follows that a negro officer in charge of a white prisoner must, when riding on a train with his white prisoner, be permitted to sit with him in the coach provided for whites, although the officer is a free agent and

the prisoner is not.  He, the negro officer, being free and in a coach or compartment set aside for the white race, would, by his very presence, more likely engender race animosity in the white occupants, resulting in a disturbance of the peace, than would the white prisoner in the negro coach or compartment, who is there restrained, to the knowledge of the black occupants, against his will.  And, if appellant's construction of the statute is to obtain, and the officer must, if he would not be separated from his prisoner, stay with him in the coach provided for the race of the prisoner, what are we to do with a case where the officer is white and has two prisoners, the one black and the other white, or where the officer is black and has two prisoners, the one white and the other black?  The officer certainly cannot sit and be and remain in both coaches.  Should not he, as we hold, be permitted to detain them all in the coach or compartment provided for the officer's race?  Or must he, as has been suggested, if he is a white officer, appoint a negro deputy to take charge of and sit with and guard the negro prisoner on the train, and vice versa?  Did the Legislature contemplate this?  If so, then to the corps of state transfer agents, who were at the time of the passage of the statute and are now appointed and hold office for the purpose of going to the several counties of the state and receiving there and removing to the penitentiary prisoners who have been convicted of crime in the courts of those counties, must be added a force of negro state transfer agents, and the appropriations for the expense of such transfer and removal of prisoners must be largely increased; for under this construction of the law it would take two transfer agents to remove two prisoners, where one is white and the other black, whereas before the statute one transfer man could remove not only two, but a dozen, although of divergent races.

Under the political conditions known to have existed at the time the statute was passed, and which it was, no doubt, then contemplated would continue to exist, and which do now exist, it is hardly to be supposed that the Legislature contemplated or intended, when passing the statute, that it was to operate so as to occasion the necessity for the appointment of negro deputies, and to entail additional burdens on the state treasury and on the several sheriffs of the state in paying the salaries and traveling expenses of the additional deputies which before was unnecessary. Nor do we think, as before said, that it can rationally be contended that the Legislature intended that the only way to avoid such appointments and such additional expense would be for the officers to adopt other means than railroad trains for transporting prisoners. The statute was passed in the year 1887, long before automobiles came into use, even before they were heard of as a practical means of conveyance, and at a time when railroad trains were the only agencies employed for quick transportation. Emergencies then, as they do now, frequently arose requiring the quick and fast removal of a prisoner to prevent him from being lynched, or to carry him to answer the summons of a court elsewhere in the state and at a long distance from the place where the prisoner might be detained. Is it to be supposed, then, that the Legislature intended to deny to sheriffs and state transfer agents this means of conveyances for prisoners, and to relegate them to the necessity of using horse teams or ox carts? If so, it would take weeks to do what otherwise could have been done in a day, and would unnecessarily hamper officers in the discharge of their duties, and delay the administration of justice and the enforcement of law.

Another suggestion is that, since the statute makes no express exceptions to, or express exemptions from,

the rule it lays down to the effect that the persons of
one race must not ride in coaches or compartments pro-
vided for the other, it must be so enforced until amend-
ed by the Legislature.  This suggestion, when analyzed,
is but another way of stating that by the statute, con-
taining as it does, no express exceptions or exemptions
from its provisions, the Legislature intended (the very
things we have endeavored to explode) that officers of
the white race having in charge a prisoner of the negro
race must, until the law is amended by the Legislature,
either abandon railroad travel in removing the prisoner,
or must appoint and employ a negro deputy to take
charge of the prisoner when on the train, or must, if he
does not do so, leave the prisoner on the coach to him-
self and take chances of his escaping or being rescued.
The Legislature, we are bound to say, intended that
some construction of the law be given as to its operation
with respect to officers of one race having in charge on
trains prisoners of another; for certainly it is more rea-
sonable to suppose that in passing the law the Legisla-
ture had in mind this condition, which is now and was
then so common and of such frequent occurrence, than
to suppose that they did not.  If they did, then what did
they intend as to this matter? · It seems to us that the
only logical and rational answer is that which we have
given, to the effect that the law was not at all intended
to operate on a prisoner, who has no free agency, and
cannot make any choice as to what car he shall sit in.
There was no need or occasion to except or exempt him
by any express terms from the operation of the law,
since basic principles of the law in general, and outside
of this statute, exempt him, in that they forbid any im-
putation of crime to a person who acts under compul-
sion.  Nor does the officer who compels the prisoner to
sit in the car provided for persons of the officer's race

offend in doing so, either expressly or impliedly, the provisions of the statute or of any other law, since it cannot be said that he is aiding and abetting the prisoner to violate the law, because, as seen, the prisoner is not violating the law as it does not operate on him. An aider or abettor in crime cannot in law or in the nature of things exist without a principal in crime; the one presupposes the other.

The statute here merely provides that it shall be unlawful for a person of one race, himself, to "ride, or attempt to ride, in a coach, or division of a coach, designated for the race to which he does not belong"; hence, it creates a crime of such a nature that it cannot be committed without the free agency of the person who actually does the riding or makes the attempt thereto. If, so, then it is a logical absurdity to say that such person can be aider and abetter in committing or attempting to commit a crime which he neither committed nor attempted. If the statute had not only prohibited, as it did, any person from "riding or attempting to ride," etc., but had also prohibited any person from forcing another so to ride, etc., then the case would be different.

We feel clear that the statute does not apply, and was not intended to apply, to prisoners, who are impliedly excepted from its operation.

As to employees who are engaged in the management of the train, it seems to us likewise clear that the statute does not and was not intended to apply. Certainly, it cannot be reasonably supposed that the Legislature intended by the law to require railroad companies to have two sets of train employees— white conductors and white porters for the coaches for white passengers, and negro conductors and negro porters for the coaches for negro passengers. Yet, in this case, as in the case of prisoners, no exception is written in the law. Why?

[Mobile & Ohio R. R. Co. v. Spenny.]

The only sensible answer, we think, is because the Legislature contemplated and intended that the law should apply only to passengers and not to train employees engaged in the management of the train, who, it was expected, were still left free to ride in any coach where their duties might call them.

As to nurses, while it would violate the terms, it would not violate the spirit, of the statute, for them to ride in the coach or compartment designated for the race to which the child or patient they may have in charge belongs; for the statute, as before pointed out, was grounded solely in a purpose to prevent race conflicts, which conflicts, it was no doubt contemplated, would not likely arise or be occasioned by the conditions named.

However, these matters are not before us and it will be time enough to deal with these questions when they arise. We have adverted to them merely for the purpose of demonstrating the integrity of our position that the statute was not intended to apply to prisoners.

The foregoing, however, expresses only the views of the writer, which, if they had been concurred in by this court, would have resulted in an affirmance of the judgment appealed from, which was in favor of the plaintiff. The majority of the court differ with the writer and are of opinion, for reasons which each of the judges has respectively stated in opnions hereto appended, that the judgment shall be reversed. It is consequently reversed, and the cause remanded.

Reversed and remanded.

PELHAM, P. J.—I am unable to agree with the reasoning adopted, or concur in the conclusion reached, by Brother THOMAS in writing to an affirmance in this case, and think the record presents matters showing

[Mobile & Ohio R. R. Co. v. Spenny.]

error requiring a reversal of the judgment of the lower court.

The result of the opinion, and in fact the direct holding, is that, in so far as the provisions of the statutes requiring a separation of the races of passengers of a common carrier are concerned (Code, §§ 5487, 5488. 7684), it is left within the discretion or caprice of a white officer in charge of a negro prisoner charged with murder, to carry such negro prisoner into a separate coach provided for the accommodation of white ladies only. If so, then any petty white officer having in charge a most desperate and repulsive negro criminal or lunatic would have the right, following only his own whim or caprice, and notwithstanding these segregation laws enacted by our law-making body, to intrude any negro prisoner in his custody into a separate coach or compartment of a train provided for the accommodation of white ladies. And if this be the proper construction of these statute for the separation of the races, there is no limit to the number, and several deputies in charge of a score or more of negro prisoners (as we know not infrequently happens in transferring prisoners) would have the right to crowd their charges into the white ladies' coach, where perhaps, there might be, and it is not unlikely to believe there would be, delicate, nervous white women seeking the comforts and seclusion of travel in a coach provided by the carrier either for their exclusive use as passengers or for the use of white persons only.

I cannot concur in a process of reasoning reaching a conclusion that operates to construe, or to ingraft an exception on, these statutes, so as to give to every petty white officer the lawful right and authority, upon his own volition, so to intrude his negro charge into a coach or compartment of a train set apart for white passengers. It is not at all impossible to suppose, if this right

to force negro prisoners into coaches designated for the travel of white people is given to every petty white officer in charge of a negro prisoner or prisoners within the state, by ingrafting an exception by construction as to them on these segregation laws, that sometimes it would be taken advantage of and resorted to by inferior deputy officers to exhibit or vaunt their superior authority and parade their importance, with the result that the very evil the statutes were enacted to remove or prevent would almost certainly follow as a consequence of judicially ingrafting upon them this exception. The construction given to these laws by my Associate, it seems to me, would be to authorize, and to clothe a certain class with the lawful right to do, that which would result in producing one of the mischiefs intended by the Legislature in the enactment of the laws to prevent, and would be violative of the spirit and contravene the very policy of the statutes.

Even if it should be conceded that the law cannot be literally enforced, and necessitates the inclusion of an exception, ingrafted under the "rule of reason," due to the fact that a conflict or ambiguity is said to arise in the law with respect to its application to this case because of the duty imposed by law on an officer to safely guard his prisoner while transferring him from one place to another, then the ruling in the Texas case (*Gulf, etc., Ry. Co. v. Sharman* [Tex. Civ. App.] 158 S. W. 1045) seems to dispose of the question very satisfactorily along those lines. While it is true that that case is not binding as a precedent on this court, the reasoning upon which it proceeds is in the main sound, and, if it is permissible at all to consider the question from the standpoint from which it is there considered, the conclusion is correct, as I view it. Perhaps the opinion goes too far in what is said of the discretion reposed in

a conductor as a matter of law, but it is not necessary to adopt that holding under the facts in this case in passing on the rights of the parties and in arriving at the conclusion reached.

It does not seem to me that enactments of the nature under consideration would be affected and held to be void as violating the provisions of the fourteenth amendment of the federal Constitution, guaranteeing to all persons equal protection of the laws, because we are aware of the history and cause for their enactment as a matter of common knowledge, and use this knowledge in applying them to concrete cases, and keep in view the object of the enactment—so long as no discrimination is made in the enforcement of the statutes, and equal protection of the law is accorded to all. It has been held to be a reasonable regulation for a carrier to have on its train a coach to be occupied exclusively by ladies.— *Bass v. Chicago, etc., Ry.,* 36 Wis. 450, 17 Am. Rep. 495. And it was held to be proper in enforcing the regulation to regard and observe the object and purpose in making it in the application and enforcement of the law. It was not to keep ladies out of other cars, but to prevent men from obtruding on ladies. We know that as a matter of common knowledge, and keeping the purpose for its enactment in mind and giving it effect, in applying the law to a concrete case, does not vitiate the law as discriminatory and unconstitutional. We also know as a matter of common knowledge that the object and purpose, as well as the legislative intent, in passing the statutes for the segregation of the races in jails and schools and on the trains and other places, was not to prevent an undesirable and unwelcome intrusion of the white people upon the colored people; and, merely having regard to the purpose and object of the enactment, in applying the law to a case in hand should not

make the statute unconstitutional as violative of the guaranty of equal protection under the laws. It is not a question of the law's making a preference or distinction, or its application in denial of equal protection under the laws, to construe an enactment in its application to a concrete case in the light of the known evil it was designed to remove or prevent. In construing these statutes and applying them, are we to be required to throw away common knowledge and common sense and blind ourselves to the universal knowledge that they were enacted by a dominant white race with a view to the preservation of peace and good order and the promotion of that race's quiet enjoyment of these places without the association of the negro race, and to prevent the evil and disturbances that are likely to result as the consequence of an undesired intrusion by negroes upon white persons in those places where a commingling of the races is provided against? The Supreme Court of the United States, in passing upon similar statutes and upholding their constitutionality, have discussed and recognized, in effect, the consideration of these matters in applying the law. Mr. Justice Brown, in delivering the opinion of the court in passing on a similar statute in *Plessy v. Ferguson,* 163 U. S. 537, 551, 16 Sup. Ct. 1138, 1143, 41 L. Ed. 256, 260, said: "If the two races are to meet on terms of social equality, it must be the result of natural affinities,  *  *  *  a voluntary consent of the individuals."

And further: "Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences."

See, also, *West Chester, etc., R. R. Co. v. Mills,* 55 Pa. 209, 93 Am. Dec. 744, approvingly cited in the Plessy Case by Mr. Justice Brown. We are supposed to have, and do have, a knowledge common to us all as to these

racial instincts and social equality of the races, and
historically know that the enactment of these laws grew
out of no purpose to meet an objection of the negro race
against association with the white race, nor to prevent
the white people from attending negro schools or rid-
ing in cars, or compartments of cars, set apart for ne-
groes. With this knowledge, if it is permissible to graft
an exception on the law so that it may be enforced and
applied under the facts and circumstances presented by
this case, it seems to me that the rule of the company
enforced by the conductor requiring the officer to leave
the negro prisoner in the coach or compartment for that
race and remain there with him, if he saw proper, was
a more reasonable rule within the spirit of the law, and
could be more properly ingrafted as an exception to the
statutes under "the rule of reason" than the holding
which ingrafts an exception which permits the negro
prisoner to be intruded by the officer into a coach or
compartment exclusively for white persons. If com-
mon sense is, as it is said to be (*Wright's Case,* 69 Ind.
163, 35 Am. Rep. 212), an important, if not an indispen-
sable, element in the successful administration of the
law, then does not this question naturally suggest itself:
If it should be a fact that the negro race claims no right
as against the intrusion upon it of the white race, how
can it then be said to be a denial of any right, equal or
otherwise, of that race for a white person to occupy a
compartment on a car set apart for the occupancy of the
negro race? I propound this only as a query, but I call
attention to the late case (January 19, 1914) of *Patsone
v. Commonwealth of Pennsylvania,* 232 U. S. 138, 144
34 Sup. Ct. 281, 282 (58 L. Ed. 539), in which the Su-
preme Court of the United States, in passing on the pro-
visions of a state statute and the object of its passage as
not being unconstitutional under the equal protection

provisions of the fourteenth amendment, in an opinion by Mr. Justice Holmes, has said: "But we start with the general consideration that a state may classify with reference *to the evil to be prevented,* and that if the class discriminated against is or reasonably might be considered to define those *from whom the evil mainly is to be feared,* it properly may be picked out. A lack of abstract symmetry does not matter. *The question is a practical one, dependent upon experience.* The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, *as a matter of fact,* it is found that *the danger is characteristic of. the class named."* (Italics supplied.)

The opinion further quotes approvingly: "The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' "—*Central Lumber Co. v. South Dakota,* 226 U. S. 157, 160, 33 Sup. Ct. 66, 67 (57 L. Ed. 164) ; *Rosenthal v. New York,* 226 U. S. 260, 33 Sup. Ct. 27, 57 L. Ed. 212, Ann. Cas. 1914B, 71; *L'Hote v. New Orleans,* 177 U. S. 587, 20 Sup. Ct. 788, 44 L. Ed. 899.

Referring to the facts in this case, we find that, with full knowledge of the law and surrounding circumstances, a white officer having in charge a negro prisoner boarded one of the appellant's regular passenger trains and insisted upon intruding his negro prisoner into a coach or compartment set apart for, and occupied exclusively by, white persons. The conductor informed the officer that it was against the law and the rules of the company for the negro prisoner to occupy a compartment set apart for the exclusive use of white passengers, and upon the officer's insisting upon having the prisoner in his charge occupy the white compartment

as a passenger, and refusing to accept one or more prof-
fers made by the conductor as to where the prisoner
would be permitted to ride, but insisting upon his right
to keep the negro in the white coach, he (the officer),
together with the negro prisoner in his charge, was eject-
ed from the train without violence or unnecessary force
being used, or indignity offered. In this the conduct-
or was complying with the letter of the law and the
rules of the company, and, if so, can his action be made
the basis of a suit for damages against the carrier by
the officer for not permitting him, in violation of the
letter of the law and rules of the company, to keep a
negro prisoner in a coach or compartment of the train
set apart exclusively for white people? It does not seem
to me that under any aspect of the case a cause of ac-
tion against the carrier for recoverable damages is
shown.

If it be conceded that an exception must be recognized
in the case of a white officer in charge of a negro pris-
oner, because of the right of the officer to use the pub-
lic carrier in the discharge of his public duty in remov-
ing the negro prisoner and safeguarding him while en
route, then it seems to me that a due regard for the leg-
islative intent and object to be obtained in passing these
segregation statutes, that I have above discussed, would
leave the door of construction, in applying the "rule of
reason" to ingrafting an exception on the statutes and
making an application to the case in hand, open to but
one conclusion; and that is that the rule of the compa-
ny, having reference to the separation of the races in
conformity with the segregation statutes, requiring a
white officer having in charge a negro prisoner either to
leave the prisoner in the compartment set apart for his
race or to remain, if he so desires for the safe-keeping of
his prisoner, in that compartment, is more reasonable

as referred to and authorized by a construction of the statutes than the opposed view which ingrafts an exception giving an officer the right to intrude a negro prisoner in a car or compartment set apart for the exclusive use of passengers of the white race. It follows that the enforcement of such a rule by the conductor would not afford the appellee legal cause for an action for damages against the appellant. And this would be true whether the statutes be literally enforced, or it be conceded that an exception can properly be ingrafted to meet the conditions presented and discussed.

It does not seem to me to be at all necessary in disposing of the issues presented on this appeal to imagine fanciful cases with respect to negro deputies in charge of white prisoners or white and negro prisoners, etc., and speculate upon the various questions and propositions that might possibly arise in the presentation of some improbable case. If complications of this nature arise in the application of the segregation statutes and rules made by common carriers in pursuance of them, in other different cases arising out of different facts and conditions, it will be time enough to dispose of the propositions presented in such cases when they arise. In the meantime, the Legislature, it is not unreasonable to suppose, may amend the statutes and provide for exceptions (as is the case with respect to similar statutes in other states) and remove even the possibility of the supposed imagined cases. But I do not believe it can be rationally contended with any support of reason that a Legislature of this state will ever pass an amendment to these statutes providing as an exception to them that every arresting officer of the state and their horde of deputies and subordinates shall have the right to intrude negro prisoners in their charge into cars or compartments set aside for white women passengers, and I

[Mobile & Ohio R. R. Co. v. Spenny.]

cannot but think that a judicial construction or ingrafting of the present laws on that subject, which makes this a right conferred or not inhibited by them, is departing from the spirit of the law as given us by the lawmaking body and is going too far afield and to an unauthorized extent in judicial construction from the legislative meaning and intent, for I feel a moral conviction that the Legislature could not have intended such results.

BROWN, J.—This is an action by the appellee against the appellant to recover damages for the breach of a contract under which, as plaintiff alleges, he was entitled to be carried as a passenger from Montgomery to Prattville on one of the defendant's trains, the defendant being engaged in the operation of a railroad as a common carrier of passengers. Some of the counts of the complaint aver that this breach consists in willfully or wantonly ejecting the plaintiff by the agents and servants of the defendant, while acting within the scope of their employment; while others set up as the breach that the ejection was unlawful or wrongful. Two of the counts of the complaint (the fourth and fifth), which set out the substantial facts as developed on the trial, aver in substance that the plaintiff was sheriff of Autauga county and was at Montgomery, Ala., having in his custody a prisoner of the negro race, whom it was his duty to carry to Prattville, in Autauga county; that, with a view of discharging this duty, he purchased from the defendant's agent at Montgomery two first-class tickets, for which he paid 35 cents each, which entitled plaintiff and his prisoner to be carried as passengers on defendant's train from Montgomery to Prattville; that plaintiff and said prisoner boarded the train as passengers, and plaintiff selected seats for himself and his

charge in a car or compartment of the train set apart and maintained exclusively for persons of the white race; that the conductor in charge of the train directed the plaintiff to go with his prisoner into the coach or compartment provided for persons belonging to the negro race, when the plaintiff refused, and thereupon the conductor refused to permit plaintiff to continue his journey, and required him and his prisoner to leave the train at the Union Station in Montgomery, a long distance from plaintiff's destination. The defendant, by its pleadings and also its evidence, insists that it should not be held liable: (1) Because the plaintiff, who had in his custody a negro prisoner, carried his prisoner into a compartment of the train set apart for the exclusive use of white passengers, and refused to obey the order of the conductor assigning the negro to the compartment set apart for use of persons belonging to the negro race, and insisted on keeping his said prisoner in said compartment provided for white passengers, and for this the conductor, under the provisions of section 5488 of the Code of 1907, had the right to eject the plaintiff and his prisoner from the train; and (2) that the defendant had a rule, which it had promulgated, of which the plaintiff had knowledge, prohibiting the carrying of negro prisoners in cars or compartments of the train set apart for the accommodation of white passengers, and that the plaintiff insisted on keeping his prisoner in the white compartment in violation of this rule, and, in the exercise of the authority conferred upon him as conductor of the train by the rule, he had the right to eject plaintiff and his prisoner from the train.

There is a slight conflict in the evidence on one point; the evidence on the part of the plaintiff tending to show that the conductor refused to allow the negro prisoner to ride in the compartment set apart for the accommo-

dation of white passengers, and insisted that the plaintiff carry the prisoner into the compartment set apart for negro passengers and that he (plaintiff) go into and remain in said compartment with said prisoner, while that on the part of the defendant tended to show that the conductor denied the right of the negro prisoner to remain in the white compartment, but left it optional with the plaintiff to place his prisoner just inside the door of the compartment provided for passengers of the negro race, and himself remain in the compartment provided for white passengers (the evidence showing that the two compartments were separated by a very thin partition and that the plaintiff would be as close to his prisoner thus situated as they would have been had they both remained in the compartment for white passengers, the conductor proposing to allow the door between the two compartments to remain open so that plaintiff could watch the prisoner), or, if he preferred, it was left optional with the plaintiff to go into the negro compartment with his prisoner. The plaintiff insisted that he would ride where he was and retain his prisoner with him, or he would have to be put off of the train. The evidence is without conflict that the ejection of the plaintiff was effected without violence, no more force being used than was necessary to accomplish the purpose.

In the first three counts of the complaint, there is nothing to indicate that the plaintiff was an officer of the law and had any more right than an ordinary citizen who had purchased a first-class ticket and was a passenger on the train, and therefore, on the undisputed evidence in the case, the plaintiff was not entitled to recover under these counts, because the conductor of the train, in the exercise of lawful authority and in compliance with the strict letter of the statute, had a right to expel him if he, in his ordinary relation as a citizen, and

not as an officer of the law, undertook to impose upon the carrier and the passengers in its care the presence of a person of different race and color, in violation of the spirit, if not the letter, of the law. And in such a case, the conductor having complied with the statute and acted within its strict letter, it cannot be insisted with any degree of seriousness that the carrier should be held liable.

A more serious question is presented by the case stated in the fourth and fifth counts of the complaint, and it is conceded by the opinion of my Brother Thomas, and by counsel on both sides, that, in order to justify recovery under those counts, an exception must be interpolated into or grafted upon the statute by judicial construction, so as to prevent its application to a negro prisoner in charge of an officer. Determining whether the court has this power, or should exercise this authority, is the delicate and vital question in this case. The manifest purpose of the statute, and the only theory upon which it can escape condemnation under the fourteenth amendment of the Federal Constitution, is that it purposes to afford equal but separate accommodations on railway passenger trains to passengers belonging to the different races.—*Plessy v. Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256; *C. & O. Co. v. Kentucky,* 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244; Brannon on Fourteenth Amendment, 87. And by express provision, in order to avoid a conflict with the power of Congress to regulate interstate commerce, the statute declares: "This section shall not apply to cases of white or colored passengers entering this state upon railroads under contracts for their transportation made in another state where like laws to this do not prevail."

The question of construing this statute is a delicate one, because embodied in it is a sentiment that is sacred

to the people of this state, their social institutions and customs, and to place a construction thereon that would operate to offend against the Federal Constitution is a result the court must avoid. It is a settled rule that the Federal Supreme Court in determining the constitutionality of a state statute will do so in the light of the established construction placed upon it by the courts of the state; and, although the letter of the statute may not offend, if it is accorded a construction by the highest court of the state that makes it offensive to the Federal Constitution, it will be stricken down.—*Louisville, New Orleans & Tex. Ry. Co. v. Miss.*, 133 U. S. 587, 17 Sup. Ct. 348, 33 L. Ed. 784; *Chesapeake & Ohio Ry. Co. v. Ky.*, 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244; Black on Interpretation of Laws (Hornbook Series) § 144. In *Austin v. Tennessee*, the United States Supreme Court, speaking by Mr. Justice Brown on a kindred subject, approved the following utterances:

"Though the law itself be fair on its face and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."—*Austin v. Tennessee*, 179 U. S. 350, 21 Sup. Ct. 132, 45 L. Ed. 224; *Yick Wo v. Hopkins*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

In the light of these settled rules of construction and the history of this state and its political conditions, showing that its policies have been shaped, its laws enforced, and its offices committed entirely to the white race for the last half century, is there not, at least, an element of doubt in the wisdom of the construction placed upon this statute in the opinion of my Brother

THOMAS? Can it be said that the construction which he places upon the statute allowing a white sheriff to carry a negro prisoner into a coach or compartment set apart and designed for use exclusively of passengers of the white race, is not an infringement upon the right of those white passengers and in violation of the Federal Constitution, and that, if indorsed by the highest court of the state, it would endanger the safety of these statutes? And likewise, is there not at least an element of doubt as to the wisdom of the construction which he places upon this statute, which would allow a negro sheriff to take a white prisoner into a coach or compartment set apart and designed for the exclusive use of passengers of the negro race? Would not this be an infringement of the rights of negro passengers to separate and equal accommodation? Indeed, I am convinced that, if the construction which he places upon this statute should be adopted as the settled construction, the constitutional integriy of the statute would be destroyed.

There is no ambiguity in the language of the statute under consideration, and it is a settled rule of construction—"that the meaning and intention of the Legislature must be sought first of all in the language of the statute itself. For it must be presumed that the means employed by the Legislature to express its will are adequate to the purpose and do express that will correctly. If the language of the statute is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey. In other words, the statute must be interpreted literally. Even though the court should be convinced that some other meaning was really intended by the law-making power, and even though the literal interpreta-

tion should defeat the very purposes of the enactment, still the explicit declaration of the Legislature is the law, and the courts must not depart from it."—Black on Interpretation of Laws, 35, 36; *Ex parte Pittsburg, etc., Co.,* 188 Ala. 234, 66 South. 489; *U. S. v. Fisher,* 2 Cranch, 358, 2 L. Ed. 304; *Doe v. Considine,* 6 Wall. 458, 18 L. Ed. 869; *Little v. Foster,* 130 Ala. 163, 30 South. 477; *Bozeman v. State,* 7 Ala. App. 151, 61 South. 604.

In the case last cited, this language is approved by this court: "When the language as used by the law-makers is plain, it is the duty of the courts to obey; no discretion is left, and the court should not stray into bypaths or search for reasons outside of the plain letter of the law upon which to rely for the purpose of giving a different meaning or interpretation, for 'when the language is plain, it should be considered to mean exactly what it says.' "—*Bozeman v. State,* 7 Ala. App. 151, 61 South. 604.

In such a case, questions of expediency or the consequences that may result from such a construction cannot be considered by the courts.

"If there be any unwisdom in the law, it is for the Legislature to remedy; for the courts the only rule is, ita lex scripta est."—Black on Interpretation of Laws (Hornbook Series) 38; *Horton v. Mobile School Commission,* 43 Ala. 598; *Ex parte Pittsburg Life Ins. Co., supra.*

Construing section 5488 of the Code in the light of these settled rules of statutory interpretation, it can have but one meaning—that is, the conductor of a passenger train is authorized and required to assign each passenger to a car, or the division of a car when it is divided by a partition, designated for the race to which such passenger belongs, and if any passenger refuses

to occupy the car, or the division of the car, to which
he is assigned by the conductor, such conductor may re-
fuse to carry such passenger on the train, and for such
refusal neither the conductor nor the railroad company
shall be liable in damages; and to read into this statute
a proviso in substance, "provided, however, that this
shall not apply to a sheriff who has in his custody a
prisoner, or shall not apply to a prisoner who is in the
custody of a sheriff," such as is contained in the Ken-
tucky statute referred to in the opinion of my Brother
THOMAS, would, in my opinion, be nothing short of "ju-
dicial legislation." The fact that inconvenience in the
transportation of prisoners may be the consequence of
such construction is no excuse for refusing to give ef-
fect to the expressed will of the Legislature, the co-or-
dinate branch of the government in which, under our
system, the power to create law resides.

However, I anticipate no such inconvenience, as it
is clear to me that the sheriff may obey this statute both
in letter and in spirit, and at the same time enjoy all
the conveniences of the modern means of transportation
afforded by railways. And, although he may not be pos-
sessed of an aversion toward the members of a different
race, or may be able to suppress it in himself, his duties
as a citizen and an officer should prompt him to avoid
endangering the peace by such feelings engendered in
others, that might possibly result from thrusting his
prisoner upon them in violation of the statute. I am
convinced, therefore, that this court has no power to
ingraft upon this statute any such exception; and if
such exception can be ingrafted at all, it is a matter for
the Legislature, and not for the courts.

But it is insisted that the sheriff is the chief executive
officer of his county, upon whom there is imposed the
duty of apprehending, transporting, and committing to

jail, offenders of the law, and is not amenable to the statute. I cannot consent to this contention. The law is supreme, and the sheriff is as amenable to the laws of the land as the most humble citizen; and, of all men, he should avoid the least semblance of an infraction of the law, because he, as the chief executive officer of his county, should be a walking personification of the law itself.

Statutes of this class, designed for the good of society, have been sustained as wholesome legislation, and a legitimate exercise of the police powers of the state for reasons which it is not here necessary to elaborate, but which are set forth in the opinion of the Supreme Court of the United States in the case of *Plessy v. Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256, and there is no authority outside of the Legislature to suspend these laws. Any attempt to place such power elsewhere would offend section 21 of the Constitution, which provides: "That no power of suspending law shall be exercised except by the Legislature."—Const. 1901, § 21; *Mitchell, etc., v. Florence Dispensary,* 134 Ala. 392, 32 South. 687; *Harlan, etc., v. State, ex rel. Clark,* 136 Ala. 150, 33 South. 858.

I cannot assent to the conclusion that the ordinary railway employees, assisting in the operation of trains, are within the purview of the statute. Such persons are on the train, not as passengers, but as employees and servants of the railroad company to protect its property, operate its trains, and guard the safety and look after the comfort and convenience of the passengers committed to their care; the statute by its very terms has no application to such employees: "The conductor of each passenger train is authorized and required to assign each passenger to the car or the division of the car," etc. This language can be applied only to a person occupying the relation of passenger.

[Mobile & Ohio R. R Co. v. Spenny.]

Neither can I concur in the conclusion that the negro prisoner was nothing but baggage. In the first place, this is right in the face of the plaintiff's contention, as set forth in the complaint, that the negro was a passenger, and entitled to be carried on the ticket which the plaintiff had procured for him; and, whether he was baggage or not, the fact remains that he was a negro and belonged to a different race from that of the passengers who had a right to occupy the compartment of the car where the plaintiff placed him, and that his presence in that compartment was an infringement upon the right of the white persons who were entitled to occupy it without his presence, and a violation of the spirit that relieves this statute from constitutional objection.

Neither do I agree that the carrier has any authority to make rules contrary to the statutory provisions which would allow persons belonging to one race to occupy a coach or compartment set apart and designed for the use of the other race and under which a sheriff or any one else, in violation of the letter and spirit of the statute, could intrude a prisoner belonging to the opposite race into such compartment. This, in effect, would be giving the carrier the right to suspend the operation of this statute, and such authority would be repugnant to the letter and spirit of section 21 of the Constitution. It may be that the carrier could adopt a rule, not in conflict, but in accord with the statute, requiring a sheriff to place a prisoner in the car or compartment set apart to passengers belonging to the prisoner's race (*West Chester R. R. Co. v. Mills,* 55 Pa. 209, 93 Am. Dec. 744; *Plessy v. Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256; *Bowie v. Birmingham Ry. & Electric Co.,* 125 Ala. 397, 27 South. 1016, 50 L. R. A. 632, 82 Am. St. Rep. 247); and if so, the violation of that rule by the officer would justify his ejection and would

be a complete answer in a suit for such ejection, provided unnecessary force was not used in expelling the passenger violating the rule. Such was one of defendant's contentions.

These views lead to the conclusion that the trial court erred in denying to the defendant the defenses afforded by the statute and such rule, and the judgment should be reversed. For these reasons, I concur in the conclusion reached by Presiding Judge PELHAM, that the judgment of the circuit court should be reversed and the cause remanded.